Good morning, everyone. The first argument case this morning is No. 15-1218, Hemopet v. Hill's Pet Nutrition, Ms. Lewis. Good morning, Your Honors. May I proceed? Please. My name is Frances Lewis, and today I will be arguing for the appellant, Hemopet. The Hemopet patents pass the Supreme Court's two-part test for identifying patent-eligible subject matter. They are not directed to abstract concepts, laws of nature, or natural phenomena. And the claims teach a physical process for making and formulating pet nutritional products based on an analysis of genomic data. Can I ask just about that physical process point? I thought that some of the claims end with language about making a product, but a bunch of them don't, just formulating a diet, which is writing down something, maybe. There is some difference? Is that right or not? You are correct that there are different limitations at the end of the claim. Some end in formulating. Some end in preparing. The district court construed the preparing term to mean making the actual nutritional composition, but I would disagree that the characterization of formulating is simply writing down the information. The district court construed those terms to mean actually designing and developing, depending on the claim, the nutritional diet or diet product. And those terms are construed to mean a particular nutrient or caloric composition. So even the claims that end with the term of a formulating limitation are directed toward the physical process. And certainly the analysis that's part of the claim, I think, also is directed to part of the physical process, even though it is computer driven. But today I'd actually like to focus my argument on three points. I want to discuss the seminal case of Diamond v. Deere and discuss how the Hemopet patents do resemble the industrial process deemed eligible in Deere. I want to address this court's holding in class in immunotherapies and why the Hemopet patents resemble the claims that were held eligible in that opinion, which is still good law. And finally, if there's time at the end, I want to address some of the more recent life sciences opinions in the area of 101, such as Mayo, Enri Braca, and Ariosa, to show how even though those claims were ineligible, the differences between the Hemopet patents and the patents in those cases counsel the finding of eligibility here. Okay. Proceed. With respect to Diamond v. Deere, this is one of the Supreme Court's seminal holdings of eligibility in a patent case. It's an older opinion, but in the last four Supreme Court opinions on Section 101 from this decade, the Supreme Court has gone out of its way to analyze and affirm the holding in Diamond v. Deere. In Deere, we had a patent that took the Arrhenius equation, which had been used previously in the process of curing rubber. And the patents claimed an innovative way of repeatedly applying that equation throughout the process of curing rubber to figure out the appropriate time and temperature, excuse me, the appropriate time based on the temperature for which to open the press. But the press in that case, these were not innovative tools. You were using the same instrumentation that had been used before, and you were using the same technology that had been used before. But didn't Deere say, and maybe Alice picked up on this, that the patentee or applicant, I guess, in Deere said our key advance is the constant monitoring of the temperature? Yes, that is correct. That's a new physical thing, right? It actually was not a new physical thing. The existence of thermocouples had been around, and it's something that Justice Stevens pointed out in his defense of Deere. No, not a measuring device that wasn't new, but Deere itself describes the applicant as characterizing its advance as using this thing to measure the temperature inside the press constantly. That is correct, but I would qualify that by saying that it wasn't just the measuring constantly. It was the application of the Arrhenius equation to constantly reevaluate the temperature in order to determine the optimal time to open it. Because without the computerized technology of the Arrhenius equation and the ability to use through a computer the repeated calculations, there would have been not much difference between what had been done before with the measurement of the temperature in the press and the time at which to open it using the Arrhenius equation. I agree with that characterization, but I do think part of the innovation in that case was the method in which they applied the computerized technology and specifically the Arrhenius equation in order to determine when to open the press. If you look at the Hemopad patents, for example, they too claim a physical process. It's a little bit broader in that it's not just limited to industrial applications. It can be a smaller sample size, for example, of mixing ingredients in a smaller situation. But it's the same idea that you're looking at coming up with new inputs to a calculation. In our case, if you look at claims... But it's not anything more than an idea, is it? This hasn't been implemented. At least the patent doesn't give any examples of the implementation of the idea, right? I would agree that it doesn't give a specific example of the implementation and the specification, but I would disagree that the claims are somehow limited to an idea. The claims themselves are the scope of the language of the patent, and they're what we turn to first to understand what the claims cover. In the claims, they outline the specific inputs that are going to be used to actually apply the ideas that are part of the invention. You look at Claims 1 and 2 of the 343, the first limitations describe the specific data inputs that you need. You're going to have to have genomic data relating to a physiological condition from bodily tissue samples or from bodily fluid samples. They then describe the process for having data relating to the effect of nutrition on the genomic data, and then through that process, and I do think that the figures in the patent outline the analysis for the claim. You use that information to analyze the genomic data, and then based on that combination, you've been able to determine, in a way that had not been done before at the time, which ingredients are likely to have an influence on the genomic data of an animal. In conclusion from that, patents don't end there. You do something with that data. You either formulate or prepare a nutritional diet or diet product, which, again, the court construed as actually designing and developing the particular nutrient or caloric composition, and that's what these claim languages cover. This is similar to the process in deer. The patent in deer, for example— Can you just clarify something, which is what I asked you at the beginning, and maybe it's the usage that I'm stuck on. Formulating a diet or formulating a diet composition or something seems to me to at least be ambiguous between deciding what foods to give and constructing the food item. Which is it? Did the district court construe the claim language to mean the physical creation of something the dog could put in its mouth? Yes, that's our understanding of the claim construction order. Part of what Hills had proposed as part of the construction of the phrase formulating a nutritional diet or diet product was the idea of simply coming up with a formula or a recipe, and the district court rejected that construction and used the terms designing and developing for the verb formulate, and then for the object of the claim, the nutritional diet or diet product, as the claim may be. The district court construed those terms to mean a particular nutrient or caloric composition. So our understanding of the district court's order is that it was concluded that there was a physical process even for part of the formulating claim. And as Your Honor had noted earlier, there are certainly different types of claims in this case, and we recognize that there is a difference between the formulating claim one, for example, and the preparing claims. And we certainly recognize that it's maybe a closer call on the formulating claims, but certainly with respect to the preparing claims, which the district court construed meant making this actual product, using definitions such as combining ingredients or mixing ingredients. Part of their objection is that your claims aren't limited to what you're now telling us, but that in their breadth, and it's the breadth that really seems to be the basis for their argument, that the limitations, the specificities, the advances are not in the claims. So we would disagree with their assertion that these claims are overly broad or somehow not limited in their application. I think we pointed out several examples in our briefing of ways in which you could use genomic analysis in a manner that would not be covered by these claims. For example, in the designing of a pharmaceutical product. Yeah, but it covers all genomic diets, right, for animals, for canines, right? No, it would only cover genomic diets that were prepared specifically following the analysis done by the claims. Oh, okay. We certainly agree that our way of doing it is likely the best way of doing it. It's part of why it's had such success in terms of hill zone use of it. But we don't think that this is the only way to take genomic information about an animal and use it in the application of it in a nutritional application. The claims set forth a very specific way of looking at the data, of analyzing that data, and then of coming up with a nutritional product as a result. What would be some other way of using recognized connections between nutrients and the expression of physiological feature-producing genes that's not covered here? Certainly, if you use that information and came up with a pharmaceutical product, that would be one example of how you would not be taking... If you're preparing a particular nutrient or caloric composition for the animal and you've gone through the data analysis steps of comparing the first set to the second set in the way described by the claims, I can certainly imagine a way, I don't think it would be as good, of taking just, for example, one of the data sets that looks at the effect of nutrition on the expression of genomic data and then maybe comparing that to the literature, for example, and saying, I see that fish oil seems to have an impact on certain genomic data, and I've read an article that shows that those similar genomic data are associated with arthritis, for example. That could be one way of applying the information that's not covered by the claim. Even if the articles were in a database? Well, if you took the articles and you put it into a database, and such that that data comprised the genetic descriptor genomic data on the effect of a physiological condition, then you would likely be running into the way the claims are structured. But that would certainly be an improvement on the process that I just described, and it would be different from what the claims cover. Let's hear from the other side. Ms. Willis, before you sit down, your brief is noncompliant with the federal rules because the spacing is not correct. It has to be double-spaced. It's 1.5-spaced. I apologize, Your Honor. I thought we had ensured that it was exactly 24-point font. The font is correct. The spacing is wrong. I understand, Your Honor. I apologize. Would you like for us to correct the brief and resubmit it? If we need to correct the brief, we will let you know. Thank you. Mr. Hales. Thank you, Your Honor. And may it please the Court, Brian Hales on behalf of Hills Pet Nutrition. I think if I can pick up just on where we left off for a moment on deer, I think one of the things that's telling about Hemopets' argument is that they want to talk about deer first and almost only deer and only get to the more recent developments in this area of law at the end if there's time. But we all know that the recent developments in this area, beginning with Mayo and then Myriad and Battalasar. The structure of almost any argument in this area now is we still have deer. We have these other things. An argument is your side says we're closer to this and their side says we're closer to that. It's not a bad strategy to say here's why we're pretty close to the one that actually rejects a 101-CHOMS. That's fair, Your Honor. But the fact is that if you look at the later cases, the claims don't pass muster. And if you look at deer, which I'll get to now, deer is distinguishable because deer does recite a very specific- But where are you going with that? All of those later cases cite deer, rely on deer as providing the foundation for drawing the lines that are drawn in the later case. And so what about where is this case on the wrong side of the line? As counsel has told us, there are certain measurements that are performed, as in deer, which bring out information not previously available, as in deer. It may very well be, as I had asked counsel, that there seems to be a bit of overreaching in saying any genetic analysis will take us where we are. But I haven't seen that response. Well, how these claims go across the line, Your Honor, is that they don't do anything other than recite the natural correlations between the genes and their relationship to disease and nutrients and their effect on gene expression. Those are clearly natural correlations. But if you discover a natural correlation, it's quite different from, as in mayo, where the natural correlation was known. Well, no, Your Honor, I think if you look at cases like mayo, myriad, and even areosa recently, the discovery of natural correlations doesn't give a party the right to claim those natural correlations and tie them up from future use. Every invention is a discovery of something that's there. Certainly, Your Honor, but in cases like myriad, the Supreme Court has said that even seminal, fundamental, very, very important revolutionary discoveries, if the claims are too closely tied to just the natural law itself, one's not entitled to a patent on that. Yeah, but I think maybe you're going too far in that. If what they'd claimed is a discovery that a combination of calcium and a couple of other minerals, as a result of this process, prevented hip dysplasia in dogs or something like that, I mean, that might well be patentable if that was novel. The problem here is not so much that it's a natural law as the abstractness and breadth of it. I agree, Your Honor, and that's what I was getting to next because the question under the Alice Mayo framework is, once we know that there are natural relationships recited, is there something that transforms it? And the only other elements we have are generic computer elements, which are rejected under Alice as transforming something into patentable subject matter, and analyze or determine the relationship step. It's just a patent on a method of analysis rather than coming up with a particular product, which does something useful. That's right, and these claims, at the end, the final step, which is where they spend the most of their effort, it's the prepare, formulate, or determine a composition claim, which they argue is tangible. There's not actually any tangible thing recited, to be clear, in any of these claims. It's a suggestion to go make something in the best case scenario for them. I think Judge Toronto is right that there's ambiguity in what some of the other terms mean, but even in the best case scenario for them where it says make, if it says make a food or make a composition, it's still abstract. There's nothing abstract about the thing that's going to go into the dog's mouth. But the claims don't recite the thing that's going to go into the dog's mouth. Food product, it's not specific. I thought there was at least one claim that talked about actually making a food product. Is that wrong? That's a direction or suggestion that, based on analysis that was done of the natural correlations, that somebody make a food product. But there's no claim to a composition anywhere in here that says a composition of food for dogs or cats reciting the following ingredient. Can I just switch back to one thing and clarify this? Is it right that all of these claims, the searching of databases, the analysis of the information you get out of the database, would cover situations in which everything in the database was old and well-known and not any new discovery at all? I think it would, Your Honor. Absolutely. In fact, these claims don't specify anything to be known versus unknown. They cover all of the correlations. As I think was discussed... Unlike even in Mayo, these patents don't involve the finding of even a new natural phenomenon, just checking information that is on a certain subject, even if that information is old. That's right, and that's true for each of the steps. But 20 years ago, you're not telling us all this was known. Well, Your Honor, the idea that nutrients could affect health has been known for generations, and the idea that nutrients could affect gene expression was absolutely known before these patents were filed, which is shown by our submission for an alternative basis to uphold the finding on three of the patents under PCT-GUI, which recite exactly these things. And PCT-GUI nearly verbatim says that we can study how nutrients affect the expression of genes and study which genes are related to disease conditions or health conditions. I guess I was just trying to pick up on, I think, what Judge Dyke was referring to, that the core of the 101 problem here is not so much that it's about natural phenomena. It is that it is about reading and analyzing information at a quite high level of generality, wherever the information may have originated 20 years ago or two days ago. I think that's right. And the third and fourth steps, the first two steps are clearly referred to natural information, and the third and fourth steps, which are the only steps left that could transform this claim, are wholly generic, wholly abstract, and recited, just as the district court said, at such a high level as to not be sufficient to transform the claims. Mayo is actually very instructive on this point because one of the things that the Supreme Court in Mayo said about the claims at issue there was that they told doctors about a natural law and suggested that doctors take it into account when treating their patients. And they went on to state it slightly differently, which is important. The claims were characterized there as telling the relevant audience about natural laws and entrusting them to use the laws appropriately where relevant to their decision-making. That's really an overstatement. They were dealing with a specific product with a known metabolite that was known to exist in the blood. It was a narrow set of facts that took the court to make some important statements based on situations such as that. Here we have, and perhaps it's a legitimate criticism of this case, of the breadth with which it's presented. But again, you do have to look back at the time this invention was made. Twenty years ago, you couldn't just push a button and have the entire genome, whether dog or cat or any of us, appear. Right, but I think as I said with respect to PCD guy that we have in the submission, Your Honor, these steps were known. I think one important point is that these claims are not limited to analyses of the whole genome. That's a fair criticism, but some of them are quite specific. Some are quite broad. I think I disagree, Your Honor. I think they're actually all very broad. None of these claims recite anything more specific than just the general recitation of looking at these natural correlations, the natural genes related to disease and how nutrients affect gene expression. And then a generic recitation of analyzing that information or determining the relationships. No claim is more specific than that. And then finally, formulating or preparing or determining a food composition. Nothing is more specific than that. And so although Hemopet wants to focus on the notion of high throughput genomics and vast volumes of data and rich amounts of data, the claims don't recite or require that. These claims are broad enough to encompass looking at a single gene, looking at a single nutrient, and making the mere decision whether to add that nutrient to a food or diet product if it's good for health or remove it if it's bad for health or not use it if it's bad for health. And that, we submit, is absolutely the type of mental process that has been routinely rejected by the Supreme Court and this Court in the recent jurisprudence. It's just too vague and too abstract. It's purely post-solution conventional activity. Because people have known for generations to, when we find something that's good for our health, make a food out of it or add it to food. And we find something that's bad for our health or an animal's health, we remove it from food or try to make a food without it. That's the only reference that exists at the end of these claims is to, based on what we saw before, or what we saw in the natural correlations, make a decision whether or not to add something good or remove something that's bad. There are pet food products out there that are offered as good for the health of your animal's teeth and gums. So, it's purely conventional and insignificant post-solution activity, the third and even the fourth step of their process, because those things have been done forever in various contexts. The only thing different, recited in these claims, is the input. Instead of talking about adding protein or removing fat or putting vitamins into a diet, we have a different set of inputs. But those inputs are the natural relationships between genes and nutrients and the expression of genes and genes and their relation to disease. Well, the point is it was well known to look to that relationship. I'm sorry, Your Honor? It was well known to look to that relationship before this patent was a priority. I think it's both conventional, because that's the most natural and logical thing to do with information that you glean about how nutrients affect the body or affect gene expression, and it was also known to do it this way because it had been done before in PCT Guide. So, I think if I go back to the point about the scope of the claims, this decision under Section 101 is based on what the claims are, how they're written and what they cover, not a narrow, selective example of a high-throughput scenario that Hemopet would like to focus on. So, unless there are more questions, I think I covered the points that I wanted to emphasize today. Any more questions? Thank you, Mr. Hicks. Ms. Rivas? May I proceed? Yes, please. I want to start on this last point, the idea that somehow genomic information has been understood and known for a long time with respect to formulating nutrition. That's not the case. Certainly, any life science field is an evolutionary process, and we don't dispute that. The idea of nutrients affecting the expression of single genes was around for a while, but genomic data is a new animal. Pardon the pun. It's a new way of looking at information that wasn't around at the time of these patents, that Hills themselves was not using in formulating their own diets until around 2003 and later. Since all of your claims talk quite generically about databases, why isn't a tiny little computer library with one gene recited in it, about which, as you say, it was understood that nutrition could affect the degree of expression of that gene, why wouldn't all of your claims read on that? Because that would not qualify under the construction of the term genomic map data and genomic data, which can include, as part of the data points, the expression of genes, but it's the relationship. It's not just the way one gene expresses itself. It's data on the relationship between those genes and the other genomic information. That's what's new about this data. And it's actually very similar to how this court ruled in the Klassen opinion, which was a few years ago and was also part of the more recent life sciences opinion, which, as far as we understand, is still good law, and Hills has not made any effort to distinguish our claims from the claims held eligible in Klassen, aside from to suggest that Klassen is no longer valid. But these claims, which, to look at the Klassen opinion, there were three separate claims in that case, one of which was held ineligible as merely an example of looking at an immunization schedule and determining an immunization schedule based on literature, and that was held ineligible. But the two claims that were held eligible in Klassen took that information, took that process of analysis, and said then apply it by going out and immunizing pursuant to that schedule. Can I just return to the subject of my last question? What aspect of the claim construction would read some term? I think you were focusing on one of the bits of language about genomic map data as requiring something more than a nucleotide sequence that would amount to one gene. I mean, as I'm reading the claim construction, genomic map is a map of part of the DNA sequence of an organism. That's part. That's not a lot. So I would direct your attention to the part of the judge's opinion. It's actually the earlier section where she construes genomic data. In the claim construction? In the claim construction order. Part of Hill's challenge had been with respect to whether or not genomic data could include gene expression data at all. Gene expression data? I'm just talking about nucleotide sequences here. Are we talking about different things? If we're just talking about nucleotide sequences, I don't think that's part of the court's construction of genomic data or genomic map data. I thought you were referring to the way the gene would then go and express itself. But I don't think within the construction of genomic map data, which the court construed as a portion of the genomic map, which are the sets of genes, that you would be able to qualify for that with just a string of nucleotides. But to conclude, I just want to point out that these claims are absolutely directed to a physical process. And whether or not they want to make an indefiniteness challenge about them at a later date, if they have that ability, that's a different question than whether or not they're directed to patent-eligible subject matter. And as this court held in Klassen and as this Supreme Court held in Deere, claims that are directed to a physical process, even if they take conventional steps and even if they consider relationships that in a vacuum might be considered abstract or laws of nature, the specific application of that technology in a specific way, as the Hemopet claims does, makes them eligible under 101. So unless there are further questions, I thank you for your time. Okay. Okay, thank you, Ms. Lewis. Mr. Hales, the case is taken under submission.